Estate of J. Harrison Faulk, Deceased, Cornelia N. Faulk, Administratrix, d.b.n., c.t.a. v. Commissioner.
Estate of J. Harrison Faulk v. Commissioner
Docket No. 20001.
United States Tax Court
1953 Tax Ct. Memo LEXIS 400; 12 T.C.M. (CCH) 29; T.C.M. (RIA) 53018; January 21, 1953
*400 Held, under all the facts, decedent's wife was a valid partner for income tax purposes during 1942 and 1943. Held, further, the amounts claimed in the partnership returns for 1942 and 1943, under the heading of "Sales Promotion," are deductible for those years as travel and entertainment expenses. L. A. Luce, Esq., 937 Munsey Bldg., Washington, D.C. and Joseph Hartman, Esq., 307 Clark Bldg., Jacksonville, Fla., for the petitioner. Newman A. Townsend, Jr., Esq., and Leigh A. Crockett, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion The respondent determined a deficiency in income tax against petitioner for the year 1943 in the amount of $77,438.18. The year 1942 is also involved due to the Current Tax Payment Act of 1943. The issues to be decided are: (1) whether petitioner is taxable upon 50 per cent of the net income of a partnership for the years 1942 and 1943; and (2) whether the partnership was entitled to deductions of $9,765 and $10,625 for 1942 and 1943, respectively, claimed to be sales promotion expenses. Findings of Fact J. Harrison Faulk (hereinafter referred to as decedent) filed his individual Federal income tax *401 returns for the years 1942 and 1943 with the collector of internal revenue at Jacksonville, Florida. He died on August 10, 1944, and his widow is administratrix of his estate. Cornelia N. Faulk (hereinafter referred to as Cornelia) and decedent were married in 1918. At the time of their marriage, decedent had little or no money. Cornelia's father was a man of some means and, until his death in 1923, sent Cornelia a check each month for an amount varying from $200 to $500. As a wedding gift he bought her a home for $12,500 and gave her $10,000 worth of bonds. Upon her father's death she received $12,908.59, plus an interest in real estate. In 1934 or 1935, decedent and his brother, Carlton W. Faulk (hereinafter referred to as Carlton) bought a wholesale liquor business in Jacksonville, Florida. They named the business King Distributing Company and operated it as a corporation until the end of 1940. Decedent and Carlton were the stockholders of the corporation. At the time the business was started, neither decedent nor Carlton had much money of their own. They owned some real estate jointly, which was mortgaged. Cornelia furnished about $7,000, which was used either to get the business *402 started or to refinance the mortgage so that they would have money to get started. She also furnished another $7,000 with which to purchase merchandise. She continued to furnish money to the business, from time to time when the need arose. At the end of 1940, the corporation was dissolved and King Distributing Company (hereinafter referred to as the Company) operated as an equal partnership between decedent and Carlton. There was no written partnership agreement at that time. Cornelia had attempted to get some interest in the business to protect her investment in it and any interest her minor daughter might derive through her. Both decedent and Carlton were opposed to giving Cornelia an interest; but when the corporation was dissolved, she became quite insistent that she either get an interest in the business or that the money she had put into the business be returned. Finally, on December 30, 1941, decedent, Cornelia, Carlton, and Carlton's wife, Marion House Faulk (hereinafter referred to as Marion), entered into an agreement, providing in part as follows: "ARTICLES OF PARTNERSHIP OF CARLTON W. FAULK AND J. HARRISON FAULK trading and doing business as KING DISTRIBUTING COMPANY, *403 NOT INCORPORATED AND CREATION OF INTEREST OF MARION H. FAULK AND CORNELIA N. FAULK. * * *
"WHEREAS the parties to this agreement became personally interested in the business known as KING DISTRIBUTING COMPANY on or about the 4th day of November, 1934, and whereas at said time there was no formal Articles of Partnership, or agreement between the parties and said parties have continued to own said business from said date to the present time, and whereas the various agreements, understandings and mutual obligations existing between them have never been reduced to writing or formally agreed to by all of the respective interested parties, and whereas the said parties are desirous of reducing their repective [respective] agreements to writing and setting out the rights, powers, obligations and privileges of each of said parties, therefore it is mutually agreed by and between the parties hereto as follows: "WITNESSETH: "1. That the said CARLTON W. FAULK and J. HARRISON FAULK do hereby become partners trading and doing business under the firm style name of KING DISTRIBUTING COMPANY, NOT INCORPORATED, and it is the intention of such parties that they shall continue to trade and *404 do business as partners under the above styled firm name until the partnership is dissolved by mutual consent or the withdrawal or death of one of the parties hereto or one of the interested parties herein, and the said MARION H. FAULK and CORNELIA N. FAULK do hereby become interested in said partnership together with the partners under the terms and conditions as hereinafter more particularly set out. "2. If one of the partners desires to terminate the partnership, he shall give the other parties hereto notice in writing of such intention not less than sixty (60) days prior to the date of such intended termination. * * *
"5. The capital assets of the partnership shall consist of the assets, property (real and personal) of the parties hereto now used, employed in or held by said parties in the mercantile business of said KING DISTRIBUTING COMPANY, NOT INCORPORATED, which assets, real and personal, as well as accounts receivable, cash and other choses in action and all obligations of said business are stated, fixed and determined and shown by the present books of account of said partnership. It is the intention of the parties hereto to formally adopt and carry on the business *405 of the partnership as heretofore begun, established and which is now so operated. It is the further intention of the parties hereto that this partnership as so established shall also assume and does hereby assume all the liabilities of said business as well as all of the assets thereof. The parties hereto shall and do own the assets and share the liabilities of KING DISTRIBUTING COMPANY, NOT INCORPORATED, in the following proportions: CARLTON W. FAULK
25%
J. HARRISON FAULK
25%
MARION H. FAULK
25%
CORNELIA N. FAULK
25%
"6. The rent of the building or buildings where the said business shall be carried on, the cost of repairs and alterations, all taxes, payments for insurance of any kind or nature whatsoever, and all other costs or expense incident to the conducting of said business and all other outgoings whatsoever in respect to the same and all the wages of all persons employed in said business and all losses which shall happen in the same shall be paid out of the capital assets of the partnership and the profits arising therefrom, or if the same be deficit, by the parties hereto in proportion to the ownership of each said party. * * *
"9. The parties *406 hereto shall be entitled to the net profits arising from the said business and remaining after all payments legally chargeable against the same have been paid, in proportion to the share each owns, provided, however, before there shall be a cash distribution of wuch [much] profits at least three (3) of the parties hereto shall agree in writing as to the amount of such cash distribution to be made. * * *
"11. In the event either partner should withdraw from the said partnership, then and in that event the remaining partner shall and does have the right, power and option to purchase the interest of such withdrawing partner, together with the interest of his wife, in and to the total assets of the business, including all property, real and personal, and accounts receivable and other debts owed the partnership, the partnership name and good-will, according to the following terms and conditions: * * *
"12. Neither MARION H. FAULK nor CORNELIA N. FAULK may dispose of her interest in said business, without the written consent of her respective husband and then only in connection with and jointly with the sale, conveyance, assignment or transfer of her husband's interest, either *407 under the terms and conditions of Paragraph 12 hereof or upon such other terms and conditions as the parties hereto may agree upon. * * *
"14. In the event of the death of any party and the exercise of the option of remaining parties, in accordance with this agreement to purchase the interest of such deceased party, then the spouse of such deceased party shall and does have the right, power and option for a period of one (1) year to purchase from the remaining parties the interest of such deceased party upon the repayment of all sums theretofore paid for such interest and the assumption of all further indebtedness due and remaining unpaid for the purchase of such interest. "15. These Articles of Partnership shall be kept in a Minute Book of the partnership and any modification or amendments hereto shall be in writing and signed by all partners and such signatures witnessed by at least one witness and shall likewise be preserved in the Minute Book of the partnership. "WITNESS our hands and seals the day and year first above written. "SIGNED, SEALED AND DELIVERED IN THE PRESENCE OF: Henry G. Aird
Carlton W. Faulk
Seal
S. W. Steele, Jr.
Marion H. Faulk
Seal
C. P. Kinchen
J. Harrison Faulk
Seal
W. N. Brown"
Cornelia N. Faulk
Seal
*408 The agreement also provided for the payment of a salary to decedent and Carlton, in the amount of $1,000 per month to each of them, and for the procedure to be followed in the case of death of any of the parties to the agreement. On October 26, 1942, decedent, Carlton, Marion, and Cornelia entered into a supplemental agreement modifying and clarifying the agreement of December 30, 1941, providing in part as follows: * * *
"A. Paragraph numbered 1 is amended so that said paragraph will read as follows: "1. That said CARLTON W. FAULK and J. HARRISON FAULK hereby ratify, confirm and approve the partnership that has existed between them under the firm name of King Distributing Company, not incorporated, since on or about November 4, 1934, and it is their intention to continue to trade and do business as partners under the above styled firm name until the partnership is dissolved by mutual consent, or the withdrawal or death of one of said partners, and it is understood and agreed that the said MARION H. FAULK and CORNELIA N. FAULK each owns an undivided one-fourth (1/4) interest, absolutely and in fee simple, in all of the assets heretofore used and now used by said partnership *409 in the operation of said business, other than real estate, and that said partnership owns the real estate, and also an undivided one-half interest in all other assets used by said partnership. * * *
"B-1. Paragraph numbered 5 of said indenture shall be amended so as to read as follows: "5. The capital assets of the partnership consist of real estate now owned by said partnership, and also an undivided one-half interest in all other assets now used, employed in, or held in the mercantile business conducted under the firm name and style of King Distributing Company, not incorporated, which assets, real and personal, as well as accounts receivable, cash, and other choses in action, and all obligations of said business as stated, fixed and determined as shown by the present books of account of the said business. It is understood and agreed that the parties hereto own all of said assets, other than real estate, in the following proportions: Carlton W. Faulk
25%
J. Harrison Faulk
25%
Marion H. Faulk
25%
Cornelia N. Faulk
25%
"C. 6. Paragraph 6 of said indenture shall be the same as said paragraph appears except the word 'partnership' appearing in the 8th *410 line from the top of said paragraph shall be eliminated, and in its place, the word 'business' shall be substituted." Paragraphs 14 and 15 of the original agreement were eliminated, and paragraph 12, providing that neither Marion nor Cornelia could dispose of her interest without the written consent of her respective husband and then only in connection with and jointly with the sale of her husband's interest, was changed to provide that either Marion or Cornelia could sell her interest under the following terms and conditions: Written notice of such desire was to be given to her husband, who would have a 90-day option to purchase such interest. If such option was not exercised, she then was to notify her brother-in-law, in writing, and he would have an additional 90 days in which to purchase. If that option was not exercised, then she would notify her sister-in-law, in writing, who would have 90 days in which to exercise the option. If none of the three parties exercised such option to purchase, she could sell her interest to any person, under any terms and conditions which she desired. This supplemental agreement was made effective as of December 30, 1941, and was signed by Carlton, *411 decedent, Marion, and Cornelia. On February 26, 1942, and March 5, 12, 19, and 26, 1942, the following notice was published in a Jacksonville, Florida, newspaper: "NOTICE "We will register with Clerk of Circuit Court, Duval County, Florida, upon receipt of proof of publication of this notice, the fictitious name to-wit: King Distributing Co., Not Inc., at 104 Jefferson Street, Jacksonville, Florida. "The parties interested in said business are J. Harrison Faulk, Cornelia Faulk, Carlton W. Faulk, Marion Faulk. Feb. 26, March 5/12/19/26, 1942 (28430)" The 25 per cent interest each of Carlton, decedent, Marion, and Cornelia was duly recorded with the Clerk of the Circuit Court, Duval County, Florida, on April 3, 1942. Decedent suffered a heart attack in 1941, and was ill during 1942 and 1943. He spent only parts of each business day in the offices of the Company. Cornelia accompanied her husband to the office during those years and assisted him in his work, having no specified duties. Decedent was in charge of the office of the Company. Carlton was in charge of buying merchandise, of sales, and of the Pensacola and Orlando branch offices of the Company. During 1942 neither *412 Cornelia nor Marion withdrew any money from the Company. Capital accounts of decedent and Carlton were closed during 1942 and new capital accounts were set up for decedent, Carlton, Cornelia, and Marion. During 1943, the only money withdrawn by any of the parties, except the $1,000 per month salaries of decedent and Carlton, was to pay income taxes. Following decedent's death on August 10, 1944, Carlton purchased decedent's interest in the Company on September 10, 1944, under the option contained in the supplemental agreement of October 26, 1942. Such sale was approved by the probate court. Upon liquidation of the Company in 1946, Cornelia received $78,194.78 in cash. In 1942 and 1943, Carlton traveled extensively for the Company, trying to get alcoholic beverages to sell, since, during those years, such supplies were difficult to obtain. He made trips to New York City, New England, and Cincinnati, at times as many as two trips to New York in a month. He spent a week to 10 days on each trip. He also made frequent trips to Orlando and Pensacola. Cornelia made several trips for the Company to the branch offices at Orlando and Pensacola, as did their chief bookkeeper and their salesmen. *413 The Company kept a hotel room at both Orlando and Pensacola on a monthly basis. A petty cash fund was kept by the Company. On his return from a trip, Carlton would turn in an expense account to the cashier, who would reimburse him for his expenses. From time to time the cashier would make out a petty cash voucher reflecting such payments, and the Company's bookkeeper would make a check to reimburse her petty cash account. Such checks were considered to be travel and entertainment expenses and were charged to an account, entitled - "Sales Promotion". In 1942 such account amounted to $9,765, and in 1943 to $10,661.45. These amounts were taken as deductions in the 1942 and 1943 income tax returns, and were the only deductions claimed in such returns which reflected travel and entertainment expenses of the Company. The respondent disallowed $9,765 for 1942 and $10,625 for 1943. Total sales for 1942 were $2,911,482.05, and for 1943 were $3,707,905.70. Some of the Company's purchases and sales during 1943 were in excess of ceiling prices allowed by the Office of Price Administration. Such payments and collections were made through the use of cash and were not reflected currently in the *414 books. At the close of 1943, Carlton instructed a certified public accountant to ascertain and enter the amounts so paid and collected upon the Company's books. As a result, the accountant, in closing the books for 1943, made adjusting journal entries increasing both sales and purchases by about $450,000. Such adjusting entries reflected items on a list showing every customer from whom the Company made a purchase and every customer to whom the Company made a sale, which list was made at the request of, and turned over to, either the Intelligence Unit or F.B.I. to be used in connection with testimony given by Carlton at a trial of someone in New York relating to ceiling price violations. During 1942 and 1943, Cornelia was a bona fide partner in the Company for Federal income tax purposes. During 1942 and 1943, the amounts of $9,765.00 and $10,661.45, respectively, were proper deductions on Federal income tax returns for the partnership for such years, representing entertainment and travel expenses of the Company. Opinion RICE, Judge: Section 3797 (a) (2) of the Internal Revenue Code defines "partnership" and "partner" as follows: "SEC. 3797. DEFINITIONS. *415 "(a) * * *. "(2) Partnership and Partner. - The term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term 'partner' includes a member in such a syndicate, group, pool, joint venture, or organization." The respondent argues that Cornelia could not be a valid partner for income tax purposes, because of the agreement drawn up between the parties, which designated Carlton and decedent to be "partners" while Cornelia and Marion only had an "interest in all the assets" in the partnership, except for real property. He relies on Burnet v. Leininger, 285 U.S. 136 (1932), where a partner-husband conveyed a one-half interest in the partnership to his wife and it was held that all the income from his share in the partnership was taxable to him. Such case, however, is distinguishable from the case at bar. There the conveyance of the interest was between the husband and wife and the other members of the partnership did not join in the conveyance. *416 In the case at bar, the agreement was between all interested parties in the business. The definition of a "partnership" for Federal income tax purposes is much broader than that of common law, since the Code specifically provides that it includes a syndicate, group, pool, joint venture, or other unincorporated organization. The interest held by the parties in this case would fall within such definition once it were determined that the parties intended to and did join together in the operation of the business. The only contested interest concerning us in this case is that of Cornelia's, and there is ample evidence to indicate a bona fide intent that she joined with decedent and Carlton in the conduct of a business enterprise. In the first place, it was primarily through Cornelia's money that the business (at that time a corporation) was started, and during the years 1935 through 1941, she continued to put money into the business. The respondent argues that there is evidence that whatever money she put into the business was returned to her prior to the agreement of December 30, 1941. But whether it was or not is immaterial, since the ultimate issue, in cases such as this, is one of *417 the intent of the parties and is determined by consideration of all the facts involved. Commissioner v. Culbertson, 337 U.S. 733 (1949). The formal agreement giving Cornelia a share in the business was drawn up at her insistence. She wanted to protect her interest in the business resulting from her investment in it and any interest her daughter might acquire through her. Decedent and Carlton had ben opposed to Cornelia's having an interest in the business, and it was only through continued persistence on Cornelia's part that they either give her an interest or return her investment that they finally assented to her demand. During 1942 and 1943, she assisted decedent in the business, trying to help him as much as possible because of his ill health. There was formal publication in the newspaper that Cornelia and Marion, along with decedent and Carlton, had interests in the business and such interests were recorded with the county court. A provision was made, in the articles of agreement, for salaries to decedent and Carlton before any distribution of profits was to be made, thus recognizing the greater services that they would give to the business. Under all the facts, *418 we hold that the parties intended to and did join the present conduct of the enterprise with Cornelia as a partner for Federal income tax purposes, and that respondent erred in including her 25 per cent of the income as taxable income to petitioner's decedent. The other issue to be decided involves the amounts listed as deductions in the Federal income tax returns for the years 1942 and 1943, under the heading of "Sales Promotion". The amounts so deducted were reasonable. Respondent concedes on brief that some travel expenses were incurred during the years in question. He argues, however, that petitioner failed to substantiate such expenses and that most of such expenses came out of the cash which Carlton took with him on his trips, for use in purchasing whiskey above ceiling prices and, therefore, must have been reflected in the approximately $450,000 adjusting entries placed on the Company's books at the close of 1943. The testimony of the independent certified public accountant, who had made an audit of the Company's books at the close of these years, was to the effect that all travel and entertainment expenses appeared in the claimed deduction entitled "Sales Promotion", and *419 appeared nowhere else, and that the adjusting entries of the approximately $450,000 were made after compilation of a complete and detailed list of customers from whom purchases, and to whom sales, were made. The testimony of the Company's bookkeeper was that, upon return from a trip, Carlton would submit an expense voucher to the cashier and be reimbursed for travel expenses. The cashier would then present a group of these vouchers to the bookkeeper who would write a check for petty cash and charge the check to travel and entertainment expense accounts. Under such circumstances, petitioner has borne the burden of proof of showing that such deductions were valid. Respondent, therefore, erred in denying the deductions of $9,765 in 1942 and $10,625 in 1943. Due to certain other uncontested adjustments, Decision will be entered under Rule 50.